UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ERIC STEPHENS and DIONA STEPHENS,

         Plaintiff,    **MEMORANDUM AND ORDER**

     -against-       00-CV-6394 (DLI)(KAM)

FORD MOTOR CREDIT CO., and WAGNER J.
CARRION, et al.,

         Defendants.
----------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

  This diversity action arises out of an automobile accident which took place in Brooklyn, New York. Plaintiff, Eric Stephens ("plaintiff"), seeks to recover personal injury and property damages. In addition, plaintiff's wife, Diona Stephens, seeks to recover damages for the deprivation of "society, services and consortium of the plaintiff."

  Defendants, Ford Motor Credit Co. ("Ford") and Wagner J. Carrion ("Carrion") now move for summary judgment on the grounds that plaintiffs have failed to present evidence of a "serious injury" as required by § 5104(a) and defined in § 5102(d) of the New York Insurance Law, commonly referred to as the "No-Fault" Law. For the following reasons, the Court finds that plaintiff has provided sufficient evidence to establish a triable issue of fact as to whether he sustained a serious injury in the August 17, 2000 collision. Therefore, defendants' motion for summary judgment is denied.

**I. Factual Background**

  On August 17, 2000, plaintiff's vehicle was involved in a collision with a vehicle operated by Carrion and owned by Ford. The collision ("Second Accident") took place on Avenue I, near the intersection of Flatbush Avenue in Brooklyn, NY. Shortly thereafter, plaintiff sought medical

attention for his injuries sustained in the accident at Excel Medical & Diagnostic Services, P.C. ("Excel"). Plaintiff previously underwent treatment at Excel for injuries resulting from a prior automobile accident that occurred on January 20, 2000 ("First Accident"). (Pl.'s Ex. 2 Dr. Chalasani's Affirm at ¶1.)

On February 4, 2000, shortly after the First Accident, plaintiff began physical therapy treatment at Excel. (Pl.'s Ex. 2 Dr. Chalasani's Affirm at ¶1.) During this treatment, plaintiff received MRI scans of his lumbar and cervical spine. On June 8, 2000, Dr. Prasad Chalasani, MD, a New York State licensed physician, reviewed the results of plaintiff's MRI scans and administered range of motion tests for plaintiff's cervical and lumbar spine regions. In a "Comprehensive Evaluation Report," dated June 27, 2000, Dr. Chalasani found that plaintiff suffered from lumbar myofascitis, a sprain/strain of the lumbar spine, and bilateral L4-5 and L5-S1 radiculopathy. (Def.'s Ex. J Dr. Chalasani's "Comprehensive Evaluation Report" dated 6/27/00 at 4.) Dr. Chalasani's analysis of plaintiff's lumbar spine MRI results led to the following diagnosis:

> Herniated disc at the L4-5 level more pronounced on the right compressing the underlying thecal sac and narrowing the right exiting nerve roots, hypertrophy in the facet joints at the L4-5 level, which is moderated on the right at this level, herniated disc at the L5-S1 level compressing the underlying thecal sac narrowing the exiting foramina and compressing the exiting nerve roots greater on the left, hypertrophy in the facet joints at the L5-S1 levels which is marked on the left, bulging disc at L3-4 level narrowing the exiting foramina and compressing the exiting nerve roots within the exiting foramina, grade I spondylolisthesis of L4 on L5 and L5-S1, hemangiomas at L2 and L3 and atypical Hemangiomas at L1-2.

(Id. at 3.)

Dr. Chalasani further found that plaintiff was suffering from cervical myofascitis and a sprain/strain of the cervical spine. (Id. at 4.) Based on Dr. Chalasani's analysis of plaintiff's cervical spine MRI results, Dr. Chalasani diagnosed plaintiff as having the following:

> Herniated disc with posterocentral osteophytes at C3-4 and C4-5 levels with mild spinal cord

compression narrowing the exit foramina, herniated disc with posterolateral osteophytes at the C5-6 level which is in contact with the underlying spinal cord and narrows the exit foramina, herniated disc at the C6-7 level which is compressing the underlying thecal sac, bulging disc at C7-T1 which is compressing the underlying thecal sac, bulging disc with annular tear at C2-3 level and a straightening of the normal cervical lordosis.

(Id. at 3.) These findings are corroborated by Dr. Randall James and Dr. Leena Doshi's reports, both of whom are New York State licensed radiologists and affiliated with Doshi Diagnostic Imaging. (Pl.'s Ex. 3 at 4-7.)

On September 8, 2000, less than one month after the Second Accident, Dr. Orsuville Cabatu of Excel examined plaintiff. Dr. Cabatu observed tenderness and restrictions in the range of motion in all directions of plaintiff's cervical and lumbar spines. (Pl.'s Ex. 2. Dr. Cabatu's "Initial Physical Medicine and Rehabilitation Comprehensive Evaluation Report" at 2.) Dr. Cabatu opined that "based on [plaintiff's] history and . . . physical examination . . . there is a reasonable degree of medical certainty that [plaintiff's] injuries were causally related to the [Second Accident.] (Id. at 3.) Plaintiff also submitted a chart entitled "Electromyography Lower Extremity" indicating "no evidence of lumbosacral radiculopathy" and another chart entitled "Electromyography Upper Extremity" indicating "no evidence of cervical radiculopathy." (Pl.'s Ex. 2.) Both charts are signed by Dr. Cabatu and dated February 2, 2001. (Id.)

On October 25, 2000, Plaintiff underwent another series of MRI scans. After reviewing these additional MRI results and administering additional range of motion tests, Dr. Chalasani diagnosed plaintiff as suffering from lumbar and cervical myofascitis/radiculopathy and a sprain/strain of both the lumbar and cervical spines. (Pl. Ex. 2. Dr. Chalasani's "Comprehensive Evaluation Report dated 10/28/02 at 4.) His analysis of the second lumbar spine MRI revealed "anterior and posterior disc herniations at L4-L5 and L5-S1 narrowing the thecal sac to the degree

of spinal stenosis, disc herniation at L3-L4, narrowing of the neural foramina bilaterally at the three levels L3-L4, L4-L5, L5-S1." (Id.) Dr. Chalasani's analysis of the second cervical spine MRI revealed, "[p]osterior disc herniations at C3-C4, C4-C5, C5-C6 and C6-C7 levels and cord impingement at multiple levels, the largest of which is at C4-C5." (Id.) All of Dr. Chalasani's findings regarding the second set of MRI results are corroborated by the reports and sworn affirmation of Dr. Thomas M. Kolb, a New York State licensed radiologist. (Pl.'s Ex. 3. at 1-3.)

Plaintiff's range of motion test results are reflected in Dr. Chalasani's "Comprehensive Evaluation" reports dated June 27, 2000 and October 28, 2002. It is difficult to measure the difference in the results of the two sets of tests because the "normal" range of motion Plaintiff's results were measured against appear to vary between the two sets of tests.[1] Nonetheless, Dr. Chalasani affirms that the range of motion test results contained in his October 28, 2002 report "represented a significant temporary partial functional impairment" of plaintiff's cervical and lumbar spine. (Pl.'s Ex. 2. Dr. Chalasani Affirm. at ¶¶ 10-13.)[1]

Based upon his evaluations and plaintiff's medical records, Dr. Chalasani opined that:

> . . . to a reasonable degree of medical certainty . . . [plaintiff] suffered the following injuries as a proximate result of the [Second Accident]: cervical myofascitis; central disc herniations at C3-C4. C4-C5, C5-C6, and C6-C7 with cord impingement, including the C3-C4, and C4-C5 disc herniations having greater impingement upon the cord; lumbar myofascitis, anterior and posterior disc herniations L3-L4, L4-L5, L5-S1 with the L3-L4 disc being previously diagnosed as a disc bulge; exacerbations of preexisting conditions to the lumbar and cervical spines.

(Id. at ¶ 11.)

---

[1] For example, in the June 27, 2000 report, the normal range of motion indicated for left lateral flexion of the lumbar spine region is 0-20°, whereas in the October 28, 2002 report, the normal range of motion indicated for left lateral flexion of the lumbar spine region is 0-45°.

Dr. Chalasani went on to say that based on his experience and examinations of plaintiff, "it can be stated with a reasonable degree of medical certainty that the weakness of the supportive tissue [along plaintiff's lumbar and cervical spine] will predispose these areas to further problems from aggravation or trauma which would not have otherwise bothered the patient prior to the [Second Accident]." (Id. at ¶15.)

Plaintiff's October 2000 MRI scans were also reviewed by a chiropractic group that treated plaintiff on August 21, 2000, shortly after the Second Accident. As reflected in a report dated November 15, 2000, the chiropractic group's prognosis was that "[b]ased on the history, as presented by [plaintiff], and relative to [the] physical examination and MRI findings, [plaintiff's] injuries were sustained in [the August 17, 2000] motor vehicle accident." (Pl.'s Ex. 2. "University Physician's Group - Chiropractic Division.") The report further indicated that the reviewing chiropractor opined that plaintiff's "injury [] caused a permanent partial disability, (primarily relative to cervical disc herniations). It is doubtful that [plaintiff] will return to a level of function consistent with abilities prior to [the Second Accident.]" (Id.)

On October 15, 2001, Plaintiff was further examined by Dr. Stanley Ross, a New York State licensed physician, and by Dr. Richard Lechtenberg, a New York State licensed neurologist. Based on this examination, Dr. Ross concluded that plaintiff's neck and back sprains were resolved and that plaintiff had "obtained maximum benefit from medical treatment." (Defs.' Ex. G at 2.) Dr. Ross' prognosis was that plaintiff had "made a satisfactory recovery from his alleged injuries with no residuals, no permanency and no disability." (Id.) Dr. Lechtenberg reached a similar conclusion after examining plaintiff and reviewing the pertinent medical records. His report stated that plaintiff "may have sustained cervical spine strains at the time of the alleged accident, but currently the

claimant has no neurologic deficits," and that at the time of the examination there were "no objective deficits that could be causally related to the [Second Accident]." (Defs.' Ex. H. at 3.) Dr. Lechtenberg further concluded that plaintiff was able to work and perform normal daily activities and would not "profit from additional medical intervention." (Id.) Both Drs. Ross and Lechtenberg swore to the truth and accuracy of their reports under penalty of perjury.

Defendants also submit the report of board certified radiologist, Dr. John T. Rigney, who reviewed plaintiff's October 2000 lumbar and cervical spine MRI scans. (Defs.' Ex. I.) Although Dr. Rigney agreed that there was evidence of disc bulges, herniations, and even cord compression, he believed that plaintiff could still be entirely free from symptoms. (Id. at 1-2.) His conclusion was that "there is no evidence of injury having been suffered by [plaintiff's] cervical or lumbosacral spine as a result of the [Second Accident]. All observed findings are chronic and degenerative in nature and precede the [Second Accident.]" (Id. at 4.)

## II. Discussion

### A. Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When ruling on a motion, the court must view any disputed information in the light most favorable to the nonmoving party. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 457, 112 S. Ct. 2072, 2076–77, 119 L. Ed. 2d 265 (1992) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513, 91 L. Ed. 2d 202 (1986)). Summary judgment is inappropriate if there is "any evidence in the record from any source from which a

*reasonable* inference could be drawn in favor of the nonmoving party" regarding a genuine issue of material fact. St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir. 2000) (emphasis added). However, the nonmoving party cannot rely on "[c]onclusory allegations, conjecture, and speculation," Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998), and must affirmatively "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Serv., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)).

    **B.**     **Serious Injury Analysis**

New York's No-Fault Law provides that in an action "for personal injuries arising out of negligence in the use or operation of a motor vehicle in this state, there shall be no right of recovery for non-economic loss, except in the case of a serious injury." N.Y. Ins. Law § 5104. The No-Fault Law defines the term "serious injury" as:

> a personal injury which results in death; dismemberment; significant disfigurement; a fracture; loss of a fetus; permanent loss of use of a body organ, member, function or system; permanent consequential limitation of use of a body organ or member; significant limitation of use of a body function or system; or a medically determined injury or impairment of a non-permanent nature which prevents the injured person from performing substantially all of the material acts which constitute such person's usual and customary daily activities for not less than ninety days during the one hundred eighty days immediately following the occurrence of the injury or impairment.

N.Y. Ins. Law § 5102(d). Plaintiff bears the burden, as a threshold matter, of establishing a prima facie case that he sustained a serious injury within the meaning of the statute. Licari v. Elliot, 57 N.Y.2d 230, 240, 441 N.E.2d 1088, 455 N.Y.S.2d 570 (1982).

The New York Court of Appeals recognizes that the legislative intent behind the enactment of the No-Fault Law was to "weed out frivolous claims and limit recovery to significant injuries," by requiring "objective proof of a plaintiff's injury in order to satisfy the statutory serious injury threshold," Toure v. Avis Rent A Car Sys., Inc., 98 N.Y.2d 345, 350, 774 N.E.2d 1197, 746 N.Y.S.2d 865 (2002) (quoting Dufel v. Green, 84 N.Y.2d 795, 798 (1995)). While the No-Fault Law clearly intended to allow plaintiffs to recover for non-economic loss in appropriate cases, "it had also intended that the court first determine whether or not a prima facie case of serious injury has been established which would permit a plaintiff to maintain a common-law cause of action in tort." Licari, 57 N.Y.2d at 237 (1982).

Plaintiff alleges that he suffered a serious injury in the Second Accident because, as a result of that accident, he experienced a permanent consequential limitation of a body organ or member, a significant limitation of use of a body function or system, and a medically determined injury which prevented him from performing substantially all of his customary daily activities for at least 90 out of the 180 days following the accident. Defendants contend that the medical evidence, particularly the reports of Drs. Ross, Lechtenberg, and Rigley, as well as plaintiff's own assertions, establish that plaintiff has not suffered a serious injury, and therefore, a grant of summary judgment is proper.

The medical evidence submitted by defendants is sufficient to meet its initial burden on summary judgment. See Kearse v. New York City Transit Auth., 16 A.D.3d 45, 49-50, 789 N.Y.S.2d 281, 285 (2005). However, this does not end the inquiry. It merely shifts the burden to plaintiff to submit objective medical evidence that raises a genuine issue of fact regarding this issue. See Toure, 98 N.Y.2d at 352.

Plaintiff did submit such evidence. Plaintiff submitted the reports of Dr. Chalasani, who

examined plaintiff both before and after the Second Accident, analyzed plaintiff's numerous MRI scans, and administered numerous range of motion tests on plaintiff. Based on his evaluations, Dr. Chalasani concluded that plaintiff had suffered significant limitations of the function of his cervical and lumbar spine as a direct result of the Second Accident. (Pl.'s Ex. 2.) A doctor's opinion supported by such objective medical evidence is sufficient to defeat a summary judgment motion. Toure, 98 N.Y.2d at 353 (finding that since the physician's opinion is supported by objective medical evidence, MRI and CT scan tests and reports, paired with his observations during plaintiff's physical examinations, such evidence was sufficient to defeat defendants' motion for summary judgment); Jacobowitz v. Roventini, 302 A.D.2d 432, 754 N.Y.S.2d 898 (2d Dep't 2003). The fact that plaintiff's injuries may have been exacerbations of pre-existing injuries is not fatal to plaintiff's case, as such exacerbations may still constitute a serious injury within the meaning of the No-Fault Law. See Gentile v. Snook II, 20 A.D.3d 389, 799 N.Y.S.2d 230 (2d Dep't 2005); Hazelton v. Brown, 248 A.D.2d 871, 873 (3d Dep't 1998).

Furthermore, Dr. Chalasani's analysis of plaintiff's MRI scans is corroborated by the reports of Drs. James, Doshi, and Kolb. His conclusion that plaintiff's injuries are causally related to the Second Accident is corroborated by the report of Dr. Cabatu and the report from plaintiff's chiropractic evaluation. These analyses are in direct conflict with the medical evidence submitted by defendants. This conflict raises questions of credibility best determined by a fact-finder. "[A]n expert's qualitative assessment of the seriousness of a plaintiff's injuries can be tested during cross-examination, challenged by another expert and weighed by the trier of fact." Toure, 98 N.Y.2d at 351. Thus, whether plaintiff suffered a serious injury in the Second Accident cannot, at this time, be decided as a matter of law. Therefore, defendants' motion for summary judgment is denied.

Since plaintiff's evidence gives rise to an arguable issue of fact as to whether he suffered a "significant limitation of use of a body function or system," the Court need not consider, for the purposes of summary judgment, whether said evidence raises an issue of fact regarding the other categories of "serious injury" under the No-Fault Law.

**III. Conclusion**

For the reasons above, defendants' motion for summary judgment is denied.

SO ORDERED.

DATED:  Brooklyn, New York
        September 28, 2005

_____/ s /_____
DORA L. IRIZARRY
United States District Judge